# THE STANDARD OIL COMPANY *v.* ANDERSON.

CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 58.   Argued January 7, 1909.—Decided February 1, 1909.

One in the general service of another may be so transferred to the service of a third person as to become the latter's servant with all the legal consequences of the new relation; but to change the relation and relieve the master requires more than the mere fact that the servant is sent to do work pointed out by such third party who has made a bargain with the master for his services.

A winchman employed by the person furnishing the hoisting power to a master stevedore for loading a vessel, held to remain that person's servant notwithstanding the hoisting signals were given by the stevedore's foreman and not to be a fellow servant of an employé of the stevedore who was injured by his negligence.

152 Fed. Rep. 166, affirmed.

THE facts are stated in the opinion.

*Mr. Charles W. Fuller* for petitioner:
The defendant and the negligent winchman did not sustain

to each other the relation of master and servant in such a sense that the defendant is liable for the winchman's negligence within the doctrine of *respondeat superior*. Hereunder, cases in which it is held that where a servant who is in the general employment of one person enters the particular or special employment of another, he becomes the servant of the special master, with relation to the particular service, and, therefore, the fellow-servant of the other employés of the special master, are in point, for the reason that they show that in such a case a servant who is thus transferred from the general employment of one person to the particular employment of another becomes, for the time being, the servant of the special master. Therefore cases of this character are cited along with the cases which involve only the application of the *respondeat superior* doctrine. See *The Harold,* 21 Fed. Rep. 428; *Lonergan* v. *The Island,* 28 Fed. Rep. 478; *The Elton,* 142 Fed. Rep. 367; *Brady* v. *Chicago &c. Ry. Co.,* 114 Fed. Rep. 100; *Sargent Co.* v. *Baublis,* 215 Illinois, 428; *Murray* v. *Currie* (1870), L. R. 6 C. P. 24; *Rourke* v. *White Moss Colliery Co.* (1876), 2 C. P. Div. 205; *S. C.,* 46 L. J. C. P. 283, affirming 1 C. P. Div. 556; *Jones* v. *Scullard* (1898), 2 Q. B. 565; *Donovan* v. *Laing &c. Construction Syndicate* (1893), 1 Q. B. 629.

In the state courts, there are decisions to the effect that the power of the special master to direct and control the servant is regarded as the decisive factor. The rule applied in these cases is that when one person lends or hires a servant to another for a particular employment, the servant for anything done in the particular employment must be dealt with as the servant of the man to whom he is lent or hired, although he remains the general servant of the person who lent or hired him. *Parkhurst* v. *Swift,* 31 Ind. App. 521; *Kimball* v. *Cushman,* 103 Massachusetts, 194; *S. C.,* 4 Am. Rep. 528; *Johnson* v. *Boston,* 118 Massachusetts, 114; *Clapp* v. *Kemp,* 122 Massachusetts, 481; *Ward* v. *New England Fibre Co.,* 154 Massachusetts, 419; *Hasty* v. *Sears,* 157 Massachusetts, 123; *S. C.,* 34 Am. St. Rep. 267; *Morgan* v. *Smith,* 159 Massachusetts, 570;

*Reagan* v. *Casey*, 160 Massachusetts, 374; *Geary* v. *Stevenson*, 169 Massachusetts, 23; *Haskell* v. *Boston Dist. Messenger Co.*, 190 Massachusetts, 189; *Ewan* v. *Lippincott*, 47 N. J. L. 192; *S. C.*, 54 Am. Rep. 148; *Delaware &c. R. Co.* v. *Hardy*, 59 N. J. L. 35; *S. C.*, 4 Am. & Eng. R. Cas. (N. S.) 577; 59 N. J. L. 562; *Norman* v. *Middlesex &c. Traction Co.*, 68 N. J. L. 728; *Grace &c. Co.* v. *Probst*, 208 Illinois, 147; *Consolidated Fireworks Co.* v. *Koehl*, 190 Illinois, 145; *Coughlan* v. *Cambridge*, 166 Massachusetts, 268; *Samnelian* v. *American Tool &c. Co.*, 168 Massachusetts, 12; *Delory* v. *Blodgett*, 185 Massachusetts, 126; *S. C.*, 102 Am. St. Rep. 328; *Anderson* v. *Boyer*, 156 N. Y. 93; *Higgins* v. *Western Union Tel. Co.*, 156 N. Y. 75; *Breslin* v. *Sparks*, 97 N. Y. App. Div. 69; *Baldwin* v. *Abraham*, 57 N. Y. App. Div. 67; affirmed, without opinion, 171 N. Y. 677.

*Mr. Bertrand L. Pettigrew* for defendant in error:

The facts show that the winchman was appointed and paid by the defendant; that he was not under the control of the contracting stevedore; that the winch which he operated as well as the dock upon which it was situated belonged to the defendant, and these facts take the case out of the rules laid down in the authorities cited by counsel for the defendant. On the general question see *Laugher* v. *Pointer*, King's Bench (1826), 5 B. & C. 547; *Quarman* v. *Burnett*, 6 M. & W. 499; *Cameron* v. *Mystrom* (1893), A. C. 308 (Privy Council); *Union Steamship Co.* v. *Claridge* (1894), A. C. 185; *St. John Gas Light Co.* v. *Hatfield*, 23 Can. Sup. Ct. Rep. 164; *Hastings* v. *LeRoy*, No. 2, 34 Can. Sup. Ct. Rep. 177.

Plaintiff in error was held liable for the negligence of its winchman in a similar case. See *Sanford* v. *Standard Oil Co.*, 118 N. Y. 571, which was cited and followed in *Johnson* v. *Netherlands Nav. Co.*, 132 N. Y. 576; *De Maio* v. *Standard Oil Co.*, 68 App. Div. 167; *Lauro* v. *Standard Oil Co.*, 74 App. Div. 4. See also *The Lisnacrieve*, 87 Fed. Rep. 570, and cases cited; *The Slingsby*, 116 Fed. Rep. 227; *The Gladestry*, 128 Fed. Rep. 591; *Otis Steel Co.* v. *Wingle*, 152 Fed. Rep. 914.

MR. JUSTICE MOODY delivered the opinion of the court.

The respondent, hereafter called the plaintiff, brought an action in the Circuit Court of the United States for the Eastern District of New York to recover damages for personal injuries alleged to have been suffered by him through the negligence of a servant of the petitioner, hereafter called the defendant.

The plaintiff was employed as a longshoreman by one Torrence, a master stevedore, who, under contract with the defendant, was engaged in loading the ship Susquehanna with oil. The plaintiff was working in the hold, where, without fault on his part, he was struck and injured by a draft or load of cases containing oil, which was unexpectedly lowered. The ship was alongside a dock belonging to the defendant, and the cases of oil were conveyed from the dock to the hatch by hoisting them from the dock to a point over the hatch, whence they were lowered and guided into the hold. The work was done with great rapidity. The motive power was furnished by a steam winch and drum, and the hoisting and lowering were accomplished by means of a tackle, guy rope and hoisting rope. The tackle and ropes were furnished and rigged by the stevedore, and the winch and drum were owned by the defendant and placed on its dock, some fifty feet distant from the hatch. All the work of loading was done by employés of the stevedore, except the operation of the winch, which was done by a winchman in the general employ of the defendant. The case was tried before a jury and the plaintiff had a verdict. The verdict establishes that the plaintiff was in the use of due care and that his injuries were suffered by reason of the negligence of the winchman in improperly lowering the draft of cases into the hold.

The only question presented is, whether the winchman was, at the time the injuries were received, the servant of the defendant or of the stevedore. If he was the servant of the defendant, as he was found to be by the courts below, the defendant was responsible for his negligence. If not, that is the

end of the case, and it is not necessary to inquire what would be the measure of liability of the stevedore.

The decision of this question requires us to consider some further facts which were not disputed. The winchman was hired and paid by the defendant, who alone had the right to discharge him. The stevedore agreed to pay the defendant $1.50 a thousand for the hoisting. The stevedore had no control over the movements and conduct of the winchman, except as follows: The hours of labor of the winchman necessarily conformed to the hours of labor of the longshoremen. The winch and winchmen were at a place where it was impossible to determine the proper time for hoisting and lowering the draft of cases of oil, and the winchman necessarily depended upon signals from others. These signals were given by an employé of the stevedore, called a gangman, who stood upon the deck of the ship and gave signals to hoist or lower by the blowing of a whistle which could be heard for a long distance. The negligence consisted in lowering a draft of cases before receiving this signal.

This case is here by certiorari from the Circuit Court of Appeals, which affirmed the judgment of the Circuit Court, because of the supposed conflict of decision in the lower Federal courts. Upon a state of facts, much resembling each other, it was held by the Circuit Court of Appeals for the Second Circuit, in *The Slingsby*, 120 Fed. Rep. 748, that the winchman was the servant of him who furnished the winch and power, and in *The Elton*, 142 Fed. Rep. 367, the contrary conclusion was reached by the Circuit Court of Appeals for the Third Circuit. In the latter case, it is true, the judgment was rested upon a question of pleading, and the observations of the court upon this subject were unnecessary to the decision. It is by no means certain that both cases do not differ materially from the case at bar as we view it, and we do not deem it necessary to question the conclusions reached in them.

We have examined the authorities selected with discrimination, and pressed upon the attention of the court in the brief,

compact and otherwise excellent arguments of counsel, though we do not deem it necessary to refer to all of them.

One who employs a servant to do his work is answerable to strangers for the negligent acts or omissions of the servant committed in the course of the service. The plaintiff rests his right to recover upon this rule of law which, though of comparatively modern origin, has come to be elementary. But, however clear the rule may be, its application to the infinitely varied affairs of life is not always easy, because the facts which place a given case within or without the rule cannot always be ascertained with precision. The servant himself is, of course, liable for the consequences of his own carelessness. But when, as is so frequently the case, an attempt is made to impose upon the master the liability for those consequences, it sometimes becomes necessary to inquire who was the master at the very time of the negligent act or omission. One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation.

It is insisted by the defendant that the winchman, though in its general employ, had ceased to be its servant, and had become for the time being, with respect to the work negligently performed, the servant of the master stevedore. This may be true, although the winchman was selected, employed, paid and could be discharged by the defendant. If it is true, the defendant is not liable. The case, therefore, turns upon the decision of the question, Whose servant was the winchman when he was guilty of the negligence which caused the injury?

It will aid somewhat in the ascertainment of the true test for determining this question to consider the reason and extent of the rule of a master's responsibility. The reason for the rule is not clarified much by the Latin phrases in which it is sometimes clothed. They are rather restatements than explanations of the rule. The accepted reason for it is that given by

Chief Justice Shaw in the case of *Farwell* v. *Boston & Worcester Railroad Corporation*, 4 Metcalf, 49. In substance, it is that the master is answerable for the wrongs of his servant, not because he has authorized them nor because the servant in his negligent conduct represents the master, but because he is conducting the master's affairs, and the master is bound to see that his affairs are so conducted that others are not injured. It is said in that case that this is a "great principle of social duty," adopted "from general considerations of policy and security." But whether the reasons of the rule be grounded in considerations of policy or rested upon historical tradition, there is a clear limitation to its extent. *Guy* v. *Donald,* 203 U. S. 399, 406. The master's responsibility cannot be extended beyond the limits of the master's work. If the servant is doing his own work or that of some other, the master is not answerable for his negligence in the performance of it.

It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still in its doing his own work. To determine whether a given case falls within the one class or the other we must in-

quire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary coöperation, where the work furnished is part of a larger undertaking.

These principles are sustained by the great weight of authority, to which some reference will now be made. The simplest case, and that which was earliest decided, was where horses and a driver were furnished by a liveryman. In such cases the hirer, though he suggests the course of the journey and in a certain sense directs it, still does not become the master of the driver and responsible for his negligence, unless he specifically directs or brings about the negligent act. *Quarman* v. *Burnett*, 6 M. & W. 499; *Jones* v. *Mayor &c.*, 14 Q. B. D. 890; *Little* v. *Hackett*, 116 U. S. 366. Though even in such cases, if the exclusive control over the driver be in the hirer, he may be responsible as master. *Jones* v. *Scullard*, 2 Q. B. (1898) 565.

In the case of *Murray* v. *Currie*, L. R. 6 C. P. 24, these facts appeared: The defendant was the owner of a ship which was provided with a winch, worked by a donkey engine, which was used for loading and unloading the cargo. He engaged a master stevedore to do the work of unloading the vessel, and agreed to supply him with the winch, the power and such sailors as the stevedore might need, deducting the amount of their wages from the agreed compensation for unloading. The stevedore selected the work for the sailors to do and had control over it and direction over the men. One of the sailors while operating the winch conducted himself so negligently that the plaintiff, who was in the employ of the stevedore, was injured, and brought this action against the defendant to recover damages, alleging that the winchman was the servant of the defendant. It was held that the winchman at the time was not the servant of the defendant but of the stevedore;

Bovill, C. J., saying: "The work of unloading was done by Kennedy (the stevedore) under a special contract. He was acting on his own behalf, and did not in any sense stand in the relation of servant to the defendant. He had entire control over the work, and employed such persons as he thought proper to act under him. He had the option of using the services of the crew of the ship; but he was under no obligation to do so. Whether he selected independent laborers or part of the crew, they were all his servants, and their acts were his acts, and not the acts of the owner. . . . Davis (the winchman) was employed in this way by the stevedore, and was doing his work, and under his control and superintendence." Willes, J., added: "The question here is, whether Davis, who caused the accident, was employed at the time in doing Kennedy's work or the shipowner's. . . . The liability of a master for the acts of his servant extends only to such acts of the servant as are done by him in the course of the master's service. The master is not liable for acts done by the servant out of the scope of his duty, even though the master may have entered into a bargain that his servant should be employed by another, and is paid for such service, as was done here." Brett, J., added: "But I apprehend it to be a true principle of law that, if I lend my servant to a contractor, who is to have the sole control and superintendence of the work contracted for, the independent contractor is alone liable for any wrongful act done by the servant while so employed. The servant is doing, not my work, but the work of the independent contractor."

The case of *Rourke* v. *The White Moss Colliery Co.,* L. R. (1876) 2 C. P. D. 205, frequently has been cited and approved by American courts. The defendant in that case was the owner of a colliery and had employed, for an agreed price, a contractor to sink a shaft. It was stipulated as part of the agreement that the defendant should provide the contractor with power, ropes and an engineer to work the engine; but with the distinct understanding that the engineer and the en-

gine should be under the control of the contractor. The engineer operated the engine so negligently that he caused injuries to the plaintiff, a servant of the contractor, who brought this action against the defendant to recover damages for his injuries, alleging that the engineer was the servant of the defendant. It was held that the engineer was not the servant of the defendant, but, for the time being, was the servant of the contractor. Cockburn, C. J., after remarking that the engineer, through whose fault the injury occurred, was undoubtedly the general servant of the defendant, said: "But these circumstances afford no ground, in point of law, for visiting the defendants with the result of the man's negligence, if he was not, in point of fact, their servant at the time, in the sense of being actually employed to do their work." He then proceeds to say that if the defendants had undertaken thus to do the work of hoisting by their machinery and servants, then they would have been liable, "for in that case Lawrence, the engineman, would have continued to be the servant of the company, and would have been working as their servant at their work." And see *Donovan* v. *Laing*, L. R. (1893) 1 Q. B. D. 189, 629, and *Union Steamship Company* v. *Claridge*, Appeal Cases, 1894, p. 185.

The two cases which have just been reviewed are much relied upon by the defendant, and for that reason have been fully stated. It should be observed that in each of them it clearly appeared in point of fact that the general servant of the respective defendants had ceased for the time being to be their servants, and had passed under the direction and control of another person, upon whose work they were engaged.

In the case of *Higgins* v. *Western Union Telegraph Co.*, 156 N. Y. 75, where a similar question was under consideration, O'Brien, J., thus expressed the principle: "The question is whether, at the time of the accident, he was engaged in doing the defendant's work or the work of the contractor. . . . The master is the person in whose business he is engaged at the time, and who has the right to control and direct his conduct."

In many cases this test has been followed. Among them are *Parkhurst* v. *Swift,* 31 Ind. App. 521; *Kilroy* v. *Canal Co.,* 121 N. Y. 22; *Wyllie* v. *Palmer,* 137 N. Y. 248; *Anderson* v. *Boyer,* 156 N. Y. 93; *Murray* v. *Dwight,* 161 N. Y. 301; *Delaware &c. R. Co.* v. *Hardy,* 59 N. J. L..35; *Consolidated Fireworks Co.* v. *Koehl,* 190 Illinois, 145; *Grace &c. Co.* v. *Probst,* 208 Illinois, 147; *Kimball* v. *Cushman,* 103 Massachusetts, 194; *Johnson* v. *Boston,* 118 Massachusetts, 114; *Delory* v. *Blodgett,* 185 Massachusetts, 126; *The Elton, supra.*

In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control.

Let the facts in evidence now be considered in the light of the foregoing principles of law. Was the winchman at the time he negligently failed to observe the signals engaged in the work of the master stevedore, under his rightful control, or was he rather engaged in the work of the defendant, under its rightful control? We think that the latter was the true situation. The winchman was, undoubtedly, in the general employ of the defendant, who selected him, paid his wages, and had the right to discharge him for incompetency, misconduct or any other reason. In order to relieve the defendant from the results of the legal relation of master and servant it must appear that that relation, for the time, had been suspended and a new like relation between the winchman and the stevedore had been created. The evidence in this case does not warrant the conclusion that this changed relation had come into existence. For reasons satisfactory to it the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum and the winchman were its own. It did not furnish them but furnished the work they did to the stevedore. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control.

Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil. But when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be coöperation and coördination, or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information, and the obedience to those signals showed coöperation rather than subordination, and is not enough to show that there has been a change of masters. The case of *Driscoll v. Towle*, 181 Massachusetts, 416, is in point here. In that case the defendant was engaged in a general teaming business. He furnished a horse, wagon and driver to the Boston Electric Light Company. The driver reported to the electric light company and received directions as to what to do and where to go from an employé of that company, but at night returned the horse and wagon to the defendant's stable and received pay from the defendant. While traveling to carry out an order received from the company he negligently injured the plaintiff, who brought an action to recover for the injuries, alleging that the driver was the defendant's servant. It was held that there was evidence which would warrant the jury in finding that the driver continued to be the defendant's servant. It was said in the opinion of the court, delivered by Holmes, C. J. (now Mr. Justice Holmes):

"But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant more than that is necessary to take him out of the relation established by the only contract which he has made and to make him a voluntary subject of a new sovereign,—as the master sometimes was called in the old books.

"In this case the contract between the defendant and the electric light company was not stated in terms, but it fairly could have been found to have been an ordinary contract by

the defendant to do his regular business by his servants in the common way. In all probability it was nothing more. Of course in such cases the party who employs the contractor indicates the work to be done and in that sense controls the servant, as he would control the contractor, if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and to make the employer liable under the fiction that the act of the employed is his act."

We think that the courts below correctly held that the winchman remained the servant of the defendant. Upon facts not differing in principle from those before us, the same conclusion was reached in *Sanford* v. *Standard Oil Co.*, 118 N. Y. 571; *Johnson* v. *Netherlands &c. Co.*, 132 N. Y. 576; *The Victoria,* 69 Fed. Rep. 160; *The Lisnacrieve,* 87 Fed. Rep. 570; *McGough* v. *Ropner,* 87 Fed. Rep. 534; *The Gladestry,* 128 Fed. Rep. 591; *The City of San Antonio,* 143 Fed. Rep. 955.

*Judgment affirmed.*